Matthew D. Stockwell
PILLSBURY WINTHROP SHAW
PITTMAN LLP
31 West 52nd Street
New York, NY 10019
Tel: (212) 858-1000
Fax: (212) 858-1500
matthew.stockwell@pillsburylaw.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# FOR DISTRICT OF NEW JERSEY

| | |
|---|---|
| IQVIA INC.,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>VEEVA SYSTEMS, INC. and<br>PETER STARK<br><br>　　　　　Defendants. | **COMPLAINT**<br><br>Case No. _____ |

Plaintiff IQVIA Inc.[1] ("IQVIA" or the "Company"), by and through its undersigned counsel, for its Complaint against Defendants Veeva Systems, Inc. ("Veeva") and Peter Stark ("Stark"), alleges as follows:

---

[1] On October 3, 2016, IMS Health Holdings, Inc. and Quintiles Transnational Holdings Inc. merged, with the combined company renamed QuintilesIMS, Inc. On November 6, 2017, QuintilesIMS, Inc. changed its name to IQVIA Inc. For convenience, we use "IQVIA" or the "Company" to refer to all of these predecessor companies and company names.

## PRELIMINARY STATEMENT

1.      By this action, Plaintiff seeks injunctive relief and damages for Defendants' flagrant breach of, and tortious interference with, unambiguous non-competition, non-solicitation, and confidentiality obligations Defendant Stark owes his former employer, IQVIA.

2.      Stark first assumed those obligations when his former company, Whitney, Danforth & Stark Associates, Inc. d/b/a Pursuit Solutions ("Pursuit"), was acquired by IQVIA in a 2016 deal that personally netted Stark a substantial pay day.  Stark continued to be subject to these non-competition, non-solicitation, and confidentiality obligations as a condition of his continued, highly-compensated employment at IQVIA, coupled with his receipt of substantial stock awards.

3.      As a key IQVIA executive, Stark has played a critical role at IQVIA, defining and leading the investments, strategy and resources of IQVIA's core marketing analytics business in the United States.  He has, in particular, directed the design and future roadmap of IQVIA's primary marketing analytics tool, Omnichannel Navigator, specifically so as to compete directly with Defendant Veeva, in measuring and optimizing the hundreds of millions of dollars life science customers spend annually on direct-to-consumer advertising and promotional activities.

4.      Stark has also worked closely with other IQVIA teams to include other marketing analytics capabilities in Omnichannel Navigator to address customer requirements relating to the billions of dollars IQVIA's life sciences customers spend on digital advertising and promotion to health care professionals – a capability IQVIA believes Veeva has likewise been wanting to add to its offerings.

5.      In 2021, Stark was given the additional responsibility to lead a detailed assessment of IQVIA's U.S. commercial technology offerings.  In this capacity, he collected trade secrets and other highly confidential information from dozens of IQVIA leaders and subject matter experts, gathering proprietary information relating to 20+ IQVIA applications and systems.  He used this

information to identify competitive gaps and strengths, and to develop (with others) the commercial technology and services strategy needed to compete with Veeva's suite of competing offerings.

6.      Stark also participated in efforts to review and analyze trade secrets and other highly confidential information gathered from IQVIA businesses around the world relating to IQVIA's global strategy to compete with Veeva's suite of competing commercial technology and services offerings.

7.      In addition to the foregoing, Stark was also a key contact for a leading global life sciences customer, for which IQVIA and Veeva have been engaged in intense, head-to-head competition.  IQVIA scored a major win in 2019 against Veeva at that customer, with Stark thereafter instrumental in building and expanding relationships at that significant customer, where the competition between IQVIA and Veeva remains intense.

8.      Against this backdrop, it is little wonder Veeva pulled out all the stops to recruit Stark – in deliberate derogation of his non-competition, non-solicitation, and confidentiality obligations to IQVIA.  The successful recruitment of Stark no doubt represents a potential game-changer for Veeva, no matter the legal barriers presented.

9.      Undeterred by such legal barriers, Veeva has actually adopted a business model of recruiting its competitors' employees in key roles, summarily corrupting the hard work Veeva's competitors have already devoted to competitive issues.   Veeva then files baseless preemptive lawsuits in California seeking to invalidate those employees' non-compete agreements.  It does so irrespective of whether the recruited employee previously worked, or will be based, in California.  Indeed, Stark himself is a long-time New Jersey resident who, upon information and belief, has no intention of relocating to California for Veeva.

10.     Veeva secretly began its employment discussions with Stark, upon information and belief, in June 2021, within weeks of Stark's presentation to IQVIA executives about his findings and strategy recommendations for the foregoing IQVIA competitive initiatives.  Meanwhile, Stark continued to actively participate in the highly confidential internal IQVIA discussions regarding commercial technology and services strategies, capabilities, functionality, and analytics for IQVIA's U.S. and global business units.  He continued accessing vast amounts of IQVIA trade secrets and other highly confidential information relating to these IQVIA businesses – businesses that are in direct competition with Veeva.

11.     Then, just as Stark's team at IQVIA prepared to launch Omnichannel Navigator in September 2021, Stark suddenly notified IQVIA he was terminating his employment with IQVIA and had accepted a senior position with Veeva, reporting directly to Veeva's CEO.  In his new position at Veeva, Stark is now leading the development of Veeva's entire commercial services strategy.  All of this is in deliberate breach of his non-competition obligations to IQVIA.

12.     No doubt hoping to assuage IQVIA's obvious concerns, Stark assured IQVIA that his employment with Veeva would not start for four months, until January 3, 2022.  Yet, upon information and belief, Stark actually began working for Veeva in October, is already commercially active with Veeva, and is guiding Veeva in the recruitment of other IQVIA employees.

13.     Thus, even though IQVIA has paid Stark a small fortune, it is clear that he has sold out to a higher bidder, Veeva, threatening to deliver to that key IQVIA competitor a wealth of IQVIA trade secrets and other highly confidential information. Immediate injunctive relief to block the irreparable injury imminently threatened here is therefore now essential. Stark's deep access to IQVIA's highly confidential, commercially sensitive information and documents — including

its strategic plans, competitive intelligence, and investment plans — underscores the seriousness of the harm threatened, particularly when Stark himself authored many of those very documents.

14.     If Veeva's brazen tactics are allowed, and Stark permitted to undeniably violate his non-competition obligations, the adverse consequences for IQVIA will be both devastating and irreversible.  Indeed, it is at this point inconceivable that Stark will not share highly sensitive IQVIA information with Veeva, in plain violation of his confidentiality obligations.

15.     Irreparable harm will also result here if Veeva and Stark are permitted to continue their tortious interference with Stark's non-solicitation obligations, contacting IQVIA's current clients and other members of Stark's former team.

16.     Therefore, in order to preserve the status quo, and to prevent the deliberate destruction of one of IQVIA's core businesses, IQVIA now seeks temporary, preliminary and permanent relief:

(a)     enjoining Stark from (1) continuing employment with Veeva in violation of his non-competition obligations; (2) directly or indirectly soliciting IQVIA customers, prospective customers, employees, suppliers, or consultants in violation of his non-solicitation obligations; and (3) violating his confidentiality obligations; and

(b)     enjoining Veeva from (1) employing Stark within the one-year restrictive period under the CRCA; (2) tortiously interfering with Stark's obligation under the CRCA not to directly or indirectly solicit IQVIA employees, customers, prospective customers, suppliers, or consultants during the one-year restrictive period; (3) tortiously interfering with Stark's confidentiality obligations under the

CRCA; and (4) tortiously interfering with any other IQVIA employees' contracts with IQVIA.

17.     Finally, IQVIA also seeks declaratory relief, as well as compensatory and punitive damages and other monetary relief, to redress — under the Delaware law specifically chosen by IQVIA and Stark — the harm caused by Defendants' wrongful conduct.

## PARTIES

18.     Plaintiff IQVIA Inc. is a Delaware corporation with a principal place of business in Pennsylvania.

19.     Defendant Veeva Systems, Inc. is, upon information and belief, a Delaware corporation with a principal place of business in California.  Veeva has numerous offices in states other than California, however, and has many employees — including Stark — who live and work in states other than California.

20.     IQVIA and Veeva are direct competitors in the business of providing market research, technology applications, and other services to the life sciences industry.  IQVIA and Veeva also have many common customers.

21.     Defendant Peter Stark is, upon information and belief, a resident of New Jersey, and a former IQVIA employee who worked for IQVIA from New Jersey.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction over this action under Article III and 28 U.S.C. § 1331 because, as detailed below, the Complaint asks this Court to interpret and apply the Dormant Commerce Clause of the United States Constitution.

23.     IQVIA seeks a judgment declaring that it is unconstitutional to apply California law to the interpretation and enforcement of non-competition, non-solicitation, and confidentiality

agreements entered into and existing between IQVIA and its employees, including Stark, who reside in and work from states other than California. The interpretation and enforceability of such agreements, including that with Stark, are, under the Dormant Commerce Clause, instead to be decided under the law of the state chosen by the parties in such agreements – in Stark's case, the law of Delaware – or, alternatively, the law of the state where the employee lives and works.

24.     An actual case and controversy exists here because Veeva contends that California's Unfair Competition Law instead governs the validity and enforceability of IQVIA's non-competition, non-solicitation, and confidentiality agreements with Veeva employees who reside and work in other states when, as here, they are employed by a company based in California, and California law renders such agreements invalid.  Veeva further contends that it is unconstitutional under the Dormant Commerce Clause to apply any law other than the law of California to those agreements to the extent that other law permits the enforcement of restrictive covenants.

25.     An actual case and controversy also exists because, upon information and belief, Stark has accepted and already begun employment with Veeva, a direct competitor to IQVIA, in breach of his contractual non-competition obligations.

26.     The Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367.

27.     This Court has personal jurisdiction over Defendant Stark because he is a resident of New Jersey.

28.     This Court has personal jurisdiction over Defendant Veeva because it regularly transacts business within the State of New Jersey and committed tortious acts within the State of New Jersey.

29.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred within this judicial district.

## FACTUAL ALLEGATIONS

**IQVIA's Business**

30.     IQVIA is a global provider of advanced analytics, technology solutions, market research data, and clinical research services to the life sciences industry in the United States, and globally.

31.     IQVIA has assembled one of the largest and most comprehensive collections of healthcare information in the world.  IQVIA's collection includes more than one billion longitudinal, non-identified patient records based on data from a wide variety of sources, including prescription and promotional data, claims data, and electronic medical records.  IQVIA data is sourced from approximately one hundred fifty thousand data suppliers and covers over one million data feeds globally.

32.     Stark worked in IQVIA's Commercial Solutions business line ("Commercial Solutions"), the largest U.S. business in IQVIA's $5 billion global Technology & Analytics Solutions segment ("TAS Segment").  The Commercial Solutions business is responsible for using IQVIA's data, advanced analytics, technology, and industry knowledge to assist life sciences companies to operate more efficiently and effectively, so that the right medicines reach the right patients in the United States.  The Commercial Solutions business line generates hundreds of millions of dollars in revenues annually.

33.     Commercial Solutions is, in turn, composed of six divisions, the second largest of which is Marketing. Previously led by Stark, that Marketing division assists life sciences clients in educating patients about treatment options, increasing awareness about diseases and

encouraging patients to speak with health care professionals about health concerns. IQVIA clients – typically, pharmaceutical companies – are assisted by IQVIA in developing successful brand and marketing plans (1) to engage with the right patients through preferred communications channels, (2) to provide the right information about medicines to those patients, (3) to measure the effectiveness of those engagements, and (4) to apply data-driven adjustments to maximize effectiveness. IQVIA services encompass both traditional (*i.e.*, non-digital) and digital marketing strategies.

34.     IQVIA is widely considered an industry leader in digital marketing analytics, having invested tens of millions of dollars in growing its business in that segment.

35.     One of the digital marketing strategies in which IQVIA's Marketing division excels is omnichannel marketing analytics. Omnichannel marketing integrates and optimizes a brand's marketing strategy across multiple channels or mediums (*e.g.,* face-to-face, telephone, television, websites, social media, etc.), providing consumers a seamless, streamlined experience.

36.     While digital marketing analytics has always been a highly competitive field in the life sciences sector, in September 2019, this industry became exponentially more competitive after Veeva acquired a company called Crossix Solutions ("Crossix"), IQVIA's fiercest competitor in digital marketing analytics. While Veeva previously had little prior experience in the field, it overnight became a significant competitor by offering patient data and marketing analytic solutions to clients on the "Crossix Data Platform" – thereby competing head-to-head with IQVIA in the digital marketing analytics space.

37.     With the arrival of the global pandemic in March 2020, traditional, non-digital marketing strategies (e.g., in-person visits between pharmaceutical sales representatives and healthcare professionals) effectively disappeared. That made digital marketing strategies (e.g.,

social media, websites, smartphone applications, etc.) mission-critical for the life sciences industry. While that industry had already been gradually reducing its reliance on traditional marketing strategies, the pandemic dramatically accelerated that shift.

38.     In light of industry changes, technology trends and the COVID-19 pandemic, IQVIA substantially increased its investments in digital and omnichannel marketing analytics and related services. IQVIA also revisited many aspects of its product and go-to-market strategies in connection with three initiatives: one for the marketing services business led by Stark, a second for the commercial services and technology offerings in the United States, and a third for similar offerings globally. Stark had a leadership role in each of these three critical business initiatives. That included his interviewing leaders and subject matter experts in these businesses to understand competitive gaps and differentiation, and then making the recommendations used by IQVIA to determine its commercial strategies in these key areas for the next two to three years.

39.     For each of these three initiatives, numerous IQVIA leaders and subject matter experts, including Stark, held a series of internal meetings to discuss the Company's confidential strategic development plan for both existing products and potential future products; its investment strategy; its marketing plans; and its plans for existing and prospective clients. The topics covered at these meetings related to a wide range of IQVIA products, services and technology platforms for the United States and other countries.

40.     Meeting attendees, including Stark, dedicated substantial time to discussing IQVIA's market research data– another core business – and how the Company could utilize those assets in its marketing and commercial strategies.

41.     Meeting attendees, including Stark, reviewed and discussed the Company's most commercially sensitive internal documents, including its research and development plans;

financial metrics and reports; budgets and projections; client lists; investment strategies; marketing and sales strategies; source code, software design, and other intellectual property; and its business plans for the next three to five years. All of this information rises to the level of IQVIA's trade secrets.

**How IQVIA Protects Its Trade Secrets**

42.     IQVIA engages in a wide variety of activities to protect its confidential and proprietary information, including requiring employees to sign appropriate forms of agreement requiring the protection of such information; the adoption of policies, standard operating procedures, guidelines, training programs and other methods to educate and guide employees to help them understand the importance of protecting such information and the methods they should use to meet these requirements; technical controls to secure information from unauthorized access; exit procedures designed to protect information in connection with the termination of employment of an employee; and methods of detecting, reporting and resolving unauthorized access to this information. Care is taken to ensure confidential and proprietary information is available to employees on a limited, need-to-know basis and to identify and manage access restrictions.

43.     IQVIA likewise engages in a wide variety of activities to ensure its clients protect IQVIA confidential and proprietary information, including the use of contracts with confidentiality clauses and license provisions which restrict the use and disclosure of this information; the requirements of the IQVIA third-party access program requiring client vendors to obtain a license from IQVIA before IQVIA data can be shared with these client vendors; the proper disposition of this information in the possession of clients and their vendors when they no longer have a right to access it; and methods of detecting, reporting and resolving any unauthorized access to this information.

44.     IQVIA also engages in a wide variety of activities to ensure its vendors protect IQVIA confidential and proprietary information, including the use of non-disclosure agreements when exploring a commercial relationship with a vendor; vendor contracts with confidentiality clauses and license provisions which restrict the use and disclosure of this information; proper disposition of this information in the possession of vendors when they no longer have a right to access this information; and methods of detecting, reporting and resolving any unauthorized access to this information.

**Stark's Employment at IQVIA**

45.     Stark joined IQVIA in January 2016, when IQVIA acquired Whitney, Danforth & Stark Associates, Inc. *d/b/a* Pursuit Solutions ("Pursuit"), an operations and analytics firm specialized in serving the commercial side of the pharmaceutical industry. Stark was a founding managing partner of Pursuit and, at the time of the acquisition, was its Chief Executive Officer. Stark was a pioneer in life sciences digital marketing analytics in general and omnichannel marketing in particular. The acquisition of Pursuit by IQVIA personally netted Stark a substantial pay day.

46.     Simultaneous with the Pursuit acquisition, Stark became the head of IQVIA's Omnichannel Marketing Services business line within its Commercial Solutions group. Stark was initially responsible for helping clients evaluate the impact of their omnichannel marketing campaigns.

47.     In 2018, Stark was promoted to Vice President and General Manager of Omnichannel Marketing.

48.     In June 2021, Stark received another promotion, this time to Vice President and General Manager of the Marketing division, thereby expanding his responsibilities far beyond omnichannel marketing.

49.     As a key member of IQVIA's U.S. business team, Stark played an integral role in developing the strategy that allowed the Company to expand in the highly competitive world of digital marketing analytics, including omnichannel marketing.   Stark was viewed as a key performer, and his compensation package reflected the fact that the business line he led was strategically important for the Company.

50.     Stark communicated regularly with the President of the IQVIA regional business unit for the United States and Canada, and regularly participated in one-on-one meetings and strategy sessions.

51.     Stark was also entrusted to work with key clients of the Company.  In 2019, IQVIA succeeded in winning substantial business with a leading global pharmaceutical company that had previously been Veeva's client.  Upon information and belief, Veeva had competed aggressively to retain that business and continues to aggressively campaign to win that business back.  Stark was one of the IQVIA leaders personally responsible for building and expanding relationships at that client and providing the client senior level support.  In that role, he identified and discussed specific client requirements and how IQVIA could meet those requirements.

52.     Stark was also directly involved in three key IQVIA initiatives:

(a)     First, Stark spearheaded development of a new platform called Omnichannel Navigator, recently launched on September 14, 2021.  That launch followed two years of development directed by Stark.  Omnichannel Navigator, which allows users to make informed decisions about their marketing spend by providing better access

to data in a user-friendly manner, was intended to differentiate IQVIA from its competitors – most importantly, Veeva/Crossix. Stark was not only personally responsible for developing the Omnichannel Navigator investment strategy, research and product development schedule, and marketing plans, he was also closely involved in designing the software and other intellectual property associated with Omnichannel Navigator, as well as the Company's other digital marketing analytic platforms and applications.

(b)  Second, Stark led a detailed 2021 assessment of IQVIA's U.S. commercial technology offerings and related commercial services offerings. In this capacity, he collected trade secrets and other highly confidential information from dozens of senior leaders and subject matter experts, and gathered information relating to dozens of applications and systems, to identify competitive gaps and strengths. Stark used this information to help develop IQVIA's commercial technology and services strategy to compete with Veeva's suite of competitive offerings.

(c)  Third, as IQVIA began developing and implementing a global commercial services and technology strategy that integrated many IQVIA commercial and technology offerings for product development and go-to-market activities Stark was the point person for coordinating that strategy in the United States. As part of this strategy, IQVIA brought together approximately fifty of the Company's global commercial leaders to identify gaps and opportunities, to make recommendations and to develop plans relating to these offerings. Stark personally participated in multiple meetings with his global counterparts throughout 2020 and 2021—meetings at which he again

had access to highly sensitive, proprietary Company documents, and directly participated in drafting the Company's product roadmaps and go-to-market plans.

53.     In sum, Stark was not just privy to IQVIA's digital marketing analytics strategy, he was deeply involved in the development of IQVIA's commercial and technology strategies worldwide, and one of the key leaders driving those activities.

54.     Stark therefore had regular and direct access to highly sensitive, confidential Company documents that contained proprietary and nonpublic information. And, as the head of a strategically important business line, Stark also participated in senior leadership's confidential strategy about how to respond to, among other things, competition from Veeva / Crossix and changes in the industry. The scope of these discussions covered a broad part of the Company's operations.

55.     Moreover, as part of his role developing Omnichannel Navigator, Stark had regular access to internal, proprietary information, about IQVIA's data suppliers and methods for merging and standardizing different sources of data – all points differentiating associated with the use of IQVIA's market research data that differentiated IQVIA services from the services provided by competitors.

56.     IQVIA's market research data are among IQVIA's most valuable assets, and are recognized as the "gold standard" in the industry.

57.     The confidential information Stark accessed at IQVIA is more than sufficient to enable Veeva to recreate competing offerings and to significantly improve and enhance Veeva's existing offerings.

**Stark's Confidentiality and Restrictive Covenants Agreement**

58.     On January 22, 2016, in tandem with the closing of the Pursuit acquisition, Stark and IQVIA entered into a Proprietary Rights and Restrictive Covenant Agreement (the "PRRCA").

59.     Execution of the PRRCA was, in fact, a specific condition of Stark's initial employment at IQVIA.

60.     That was then followed, on April 10, 2019, by the superseding Confidentiality and Restrictive Covenants Agreement (the "CRCA", a copy of which is attached hereto as Ex. A).

61.     Execution of the CRCA was a condition of Stark's continued employment at IQVIA and Stark's receipt of equity grants from the Company.

62.     The PRCCA and CRCA contain substantively identical employee confidentiality obligations. The CRCA then contains a non-competition agreement providing that, for one-year after the end of his employment IQVIA, Stark shall not, directly or indirectly:

> (1)     perform or provide any Services for any Competitor, on my own behalf or that of any other Person, if such Services: (A) are in relation to an offering, product, or service that is similar to or competes with a Company Offering with respect to which I had any material involvement or access to Confidential Information in the twelve month period preceding my termination and (B) are similar to the Services I performed for the Company during the twelve month period preceding my termination; or

> (2)     perform or provide any Services for any Person that are likely to result in my use or disclosure of any Confidential Information.

Ex. A § 3.

63.     "Competitor" is broadly defined as any entity or person "that is then either directly or indirectly planning to develop, developing, providing, offering, selling or supporting any product or service that is competitive, in whole or in part, with any" "product or service of the Company in the past or present or hereafter being offered, supported or under development." *Id.* § 2.

64.     "Confidential Information" is defined as:

[I]nformation that is confidential or proprietary to the Company or Third Parties, in whatever form disclosed and whether received or created before or after the effective date of this Agreement and regardless of whether such information is labeled or designated formally as confidential, including, but not limited to: Trade Secrets; inventions, technical information, methodologies, advancements or improvements to current solutions, and new innovations; pricing information; internal financial or operational metrics information related to operational reviews; business plans, marketing plans, initiatives, programs or strategies, business methods, business processes and systems; research and development plans; customer, supplier, and employee lists; information regarding customer requirements, preferences, and business or marketing plans or results that are not generally known; data, databases, designs, specifications, software designs, and documentation; and any other information which is not generally disclosed by the Company or Third Parties or otherwise publicly available, and which may be useful or helpful to the Company or Third Parties and may give the Company or Third Parties a competitive advantage.

*Id.* § 1(a)(1).

65.     Stark agreed that this restriction applied "anywhere in the world where [IQVIA] conducts business", with the understanding that technology allows remote work from any location, and that IQVIA's goodwill extends globally and is not limited to any particular region. *Id.* § 3(c).

66.     The CRCA permits Stark to seek employment from or be employed by other medical, pharmaceutical, and biotechnology companies, or other certain types of companies, that did not meet the definition of a competitor. *Id.* § 3(b).

67.     Stark expressly agreed that the type, scope, and period of restriction imposed by the CRCA was fair and reasonable.  *Id.* § 5(a). Stark also expressly agreed that the restrictions were reasonably required to protect and maintain IQVIA's proprietary and business interests and goodwill. *Id.*

68.     In addition to the foregoing one-year non-competition restriction, the CRCA contains an indefinite confidentiality restriction, prohibiting Stark from "disclos[ing] Confidential

17

Information . . . to anyone inside or outside of the Company," and from "us[ing] such information for [his] own personal benefit or that of any third party." *Id*. § 1(a).

69.    Stark also agreed in the CRCA with respect to "solicitation" that, during his employment and for one-year after termination of his employment, he would not, "directly or indirectly":

> a. [S]olicit, induce, entice or procure, or endeavor to solicit, induce, entice or procure any customer, data supplier, prospective customer or prospective data supplier of the Company (with whom I had contact on behalf of the Company during the last twelve (12) months of my employment with the Company), or about which I had access to Confidential Information, in order to sell or obtain services that the customer or data supplier had obtained from the Company or offer to sell to such customer or prospective customer, or obtain from such data supplier or prospective data supplier, the same, similar or related products or services the Company offers to its customers or acquires from its data suppliers during my employment;

> b. [S]olicit, induce or entice, or endeavor to solicit, induce or entice any customer, data supplier, prospective customer or prospective data supplier to cease doing business, or alter or limit its business relationship, with the Company, or to otherwise interfere with the business relationship between the Company and such Person;

> c. [S]olicit, induce, entice, hire or engage, or endeavor to solicit, induce, entice, hire or engage any employee or consultant of the Company to leave such employment or consultancy; or

> d. [E]mploy or otherwise engage or use the services of any Person who is or was an employee or consultant of the Company if such engagement or services would result in a breach of any non-competition, non-solicitation, or confidentiality obligation owed by that Person to the Company.

*Id*. § 4.

70.    Stark agreed that any breach of the CRCA would cause irreparable harm to IQVIA, for which monetary damages would not be adequate, because Stark's services "are personal and unique," and because he would "have access to Confidential Information." *Id*. § 8(b).

71.    Stark agreed in the CRCA that IQVIA would be entitled to injunctive relief without the requirement to post any bond or security for breach of the Agreement. *Id*.

72.     The CRCA contains a Delaware choice of law provision stating that, "this Agreement and any action related thereto will be governed and interpreted by and under the laws of the State of Delaware without giving effect to any conflicts of laws principles that require the application of the law of a different state." *Id.* § 8(g).

73.     At all times during Stark's employment with IQVIA, he was subject to, and agreed to, the confidentiality, non-competition, and non-solicitation obligations imposed, first, by the PRRCA, and then by the CRCA.

**Stark's Stock Award Agreements**

74.     In 2013, and then in 2017, IQVIA established stock incentive compensation plans (the "Stock Incentive Plan" or "Plan") by which it would award stock options, stock appreciation rights, and performance shares to selected employees, giving those employees a personal economic stake in IQVIA's growth, development, and financial success; incentivizing employees to devote their best efforts to IQVIA; and retaining the services in particular of those employees who were in a position to make significant contributions to IQVIA's success.

75.     Beginning in 2017, Stark participated in, and financially benefitted from, IQVIA's Stock Incentive Plan every year.  Stark was granted, each year, performance shares, restricted stock, and stock appreciation rights under multiple award agreements (the "Stock Award Agreements"). True and correct copies of those Stock Award Agreements are attached hereto as Ex. B.

76.     Over his six-year tenure at IQVIA, Stark received substantial additional compensation under these Stock Award Agreements.

77.     The Stock Award Agreements state that IQVIA may cancel, rescind, withhold, or otherwise limit or restrict the performance shares, restricted stock, and stock appreciation rights

granted to Stark if Stark breaches the Stock Award Agreements. Ex. B, p. 4 § 12, p. 22 § 9, p. 39-40 § 12, p. 56 § 8, p. 75-76 § 12, p. 92 § 8, p. 111-112 § 12, p. 128 § 8, p. 149 § 12, p. 163 § 8, p. 179 § 10.

78.     Stark also acknowledged and agreed in the Stock Award Agreements that,

> [He] is bound by the confidentiality and other covenants contained in one or more restrictive covenant and confidentiality agreements that he . . . has executed with [IQVIA], which covenants and agreements are incorporated herein by reference and shall survive any settlement, expiration, forfeiture or other termination of this Agreement.

*See id.*

79.     Stark further agreed that "the opportunity to participate in the Plan and financial benefits that may accrue from such participation, is good, valuable and sufficient consideration" for being bound by those restrictions. *See id.*

80.     Stark further agreed that, if he violated any restrictive covenant and confidentiality agreements with IQVIA, then the remedy for such breaches would include the forfeiture, to the extent then outstanding, of all such outstanding shares, for no consideration. *Id.*

81.     Stark further agreed that, to the extent the performance shares and restricted stock units had already been settled, or the stock appreciation rights had already been exercised, then on or after the date that is eighteen (18) months before Stark's cessation of employment, with respect to the shares issued upon such settlement and exercise (including shares withheld for taxes), Stark shall pay to IQVIA an amount equal to (1) the aggregate fair market value (as defined in the Awards) of such shares as of the date of exercise, plus (2) the excess, if any, of the aggregate proceeds of all sales of such shares over the amount described in subsection (1). *Id.*

82.     The Stock Award Agreements, like the CRCA, also contain Delaware choice of law provisions. *See* Ex. B, p. 7 § 19, p. 24 § 15, p. 42 § 18, p. 58 § 13, p. 78 § 18, p. 95 § 13, p. 114 § 18, p. 131 § 13, p. 151 § 18, p. 165 § 13, p. 181 § 15.

**Defendants' Unlawful Activities**

83.     Upon information and belief, in or around June 2021, Veeva began recruiting Stark, attempting to lure him away from IQVIA.

84.     On August 27, 2021, Stark quietly sold all his remaining IQVIA equity shares earned under the Stock Award Agreements, netting a large profit.

85.     Upon information and belief, on September 1, 2021, Veeva formally offered Stark a job as its Executive Vice President of Commercial Strategy, reporting directly to Veeva's CEO, Peter Gassner.

86.     Upon information and belief, Stark accepted Veeva's formal job offer on or about September 2, 2021, and thereafter informed his immediate supervisor, Matthew Guagenty, that he was resigning from IQVIA.

87.     Stark also informed Guagenty that he would be deferring his start of work at Veeva until January 3, 2022.

88.      In the course of his conversation with Guagenty, Stark admitted that he was going to Veeva, in part, because he hoped to thereby circumvent compliance with his restrictive covenants and his confidentiality obligations to IQVIA.

89.     The timing of Veeva's employment offer to Stark, and Stark's acceptance of same, was plainly calculated to interfere with Stark's video presentation about the Company's global omnichannel customer engagement strategy, scheduled for the week of September 6, 2021.

90.     Omnichannel Navigator – the market differentiating platform that IQVIA had dedicated two years to developing under Stark's leadership – was scheduled to launch on September 14, 2021.

91.    Veeva knew full well that Stark was prohibited from (1) accepting employment with Veeva for a one-year period following the end of his employment with IQVIA, (2) soliciting IQVIA customers or employees for the same one-year period, and (3) disclosing confidential information to Veeva.

92.    Despite assuring IQVIA that he would not commence his employment with Veeva until January 2022, upon information and belief, Stark has already begun working for Veeva, and is already commercially active with Veeva.

**The Same Day Stark Resigns from IQVIA, Defendants Commence a Preemptive Lawsuit in California**

93.    On September 2, 2021 – the very same day that Stark resigned from IQVIA – Veeva and Stark commenced a preemptive lawsuit against IQVIA in the Superior Court of the State of California, County of Alameda, seeking a declaration that Stark's non-competition, non-solicitation and confidentiality agreements are all unenforceable.  *See Veeva Sys. Inc. et al. v. IQVIA, Inc.,* Case No. RG21111679 (Cal. Super. Ct. 2021) (the "California Action"). Veeva and Stark's Complaint in the California Action is attached hereto as Ex. C.

94.    Veeva and Stark allege in the California Action that California law governs Stark's non-competition, non-solicitation, and confidentiality obligations.  They further allege that, under the Dormant Commerce Clause and California law, those contractual obligations are all unenforceable.

95.    Veeva and Stark allege in the California Action that, to the extent Stark's restrictive covenants are enforced under the laws of Delaware, New Jersey, New York, Connecticut or North Carolina, those "Sister State Laws violate the dormant Commerce Clause," and "impose unconstitutional barriers to interstate commerce and cause economic balkanization." Ex. C § 1.

96.     In the California Action, Veeva and Stark acknowledge that Veeva is "a competitor . . . of IQVIA, and [] a business that shares common customers with IQVIA." *Id.* ¶ 50.

97.     Veeva and Stark further admit that, despite Stark's non-competition, non-solicitation and confidentiality restrictions, "[o]n September 1, 2021, Veeva offered Stark a job as its Executive Vice President of Commercial Strategy," and the next day, "[o]n September 2, 2021, Stark accepted the job offer from Veeva." *Id.* ¶¶ 44, 47.

98.     Veeva and Stark acknowledge that, "[a]s part of Veeva's offer to Stark, and because of IQVIA's NCA/NDAs, Veeva has agreed to indemnify Stark for any losses he might incur as a result of his departure from IQVIA and his employment with Veeva." *Id.* ¶ 46.

99.     All of this is consistent with the statements on Veeva's website expressly urging employees of competitors like IQVIA to "[b]reak the cycle" of non-competition restrictions, urging them not to "let the threat of a lawsuit derail [their] career." *See* Ex. D, Veeva, Our Position on Non-Compete Agreements, at https://www.veeva.com/noncompetes/.

**Veeva Attempts to Poach Other IQVIA Employees**

100.     Since Stark's departure, Veeva has contacted members of Stark's former team, offering them promotions and additional compensation if they leave IQVIA to work for Veeva.

101.     Upon information and belief, Stark is assisting Veeva in this wrongful campaign to poach other IQVIA employees.

**IQVIA Faces Imminent and Irreparable Harm**

102.     Stark's actions are in blatant disregard of his non-competition, non-solicitation, and confidentiality obligations – restrictions Stark previously agreed were reasonable and necessary to protect IQVIA's business interests and goodwill.

103.    Stark has been a key IQVIA employee for years, managing a strategically important business line.  He had access to highly confidential information not just about his own business line, but a substantial number of commercial services and technology offerings in the United States and other countries. Stark also had access to highly confidential and proprietary information about the Company's market research data, which are highly protected assets of the Company.

104.    If Stark is now able to violate his confidentiality obligations with impunity, and allowed to share IQVIA's proprietary information with Veeva, compete with IQVIA, and poach his former colleagues, IQVIA will suffer irreparable injury.  Its direct competitor, Veeva, will gain an enormous – and wholly undeserved -- strategic advantage, securing a direct roadmap to IQVIA's business strategies in a highly competitive and growing business segment.

105.    Stark's disclosure of confidential information would also be devastating to IQVIA's customer goodwill.  Veeva will surely use IQVIA's internal information to attack IQVIA's critical customer relationships, including those previously led by Stark and where Stark had a key role.

106.    Accurately quantifying the lost revenues from prospective clients that might have contracted with IQVIA but that, as a result of Veeva's unfair competition, do not, will also be impossible. It will be immeasurably more difficult for IQVIA to secure business from these clients in the future.

107.    Stark is not just any employee.  He held a leadership role, and personally designed the Company's roadmap for an important business line – one that, due to the pandemic, has grown in importance.  Stark was also on the frontlines of developing IQVIA's strategy to outperform its competitors, including Veeva.  The notion of him now switching sides for personal gain, in deliberate violation of his contractual obligations, is abhorrent.

108.     Moreover, given Stark's level of responsibility at IQVIA, his particular role, and the information and documents to which he had access, and his direct reporting relationship now to Veeva's CEO, his disclosure of IQVIA's confidential information to its direct competitor, Veeva, is inevitable.

## FIRST CAUSE OF ACTION
### *Declaratory Judgment*
### *(against all Defendants)*

109.     IQVIA repeats and realleges paragraphs 1-108 as if fully set forth herein.

110.     Veeva has publicly taken the position that, if former IQVIA employees who reside and work outside California, such as Stark, become employees of Veeva, any restrictive covenants to which they are bound (*e.g.*, non-competition, non-solicitation, and confidentiality agreements) are suddenly governed by California law.  It makes no difference, Veeva contends, whether the contracts containing those covenants select the law of a different state, or whether the employee resides and works outside of California.

111.     Veeva further contends that, under California law, such restrictive covenants are unenforceable and that, if other states' laws recognize or enforce such restrictive covenants, those laws violate the Dormant Commerce Clause, because they impose unconstitutional barriers to interstate commerce.

112.     Veeva also maintains that any attempt by IQVIA to enforce such a restrictive covenant against a former employee now employed by Veeva, including Stark, under the laws of a state where it is lawful to do so, then subjects IQVIA to liability in California.

113.     In their complaint in the California Action against IQVIA, Veeva and Stark assert two different causes of action that specifically allege potential violations of the dormant Commerce Clause.  In both claims, they seek a declaration that IQVIA's restrictive covenants are either invalid

under each of five different state laws, or if they are valid, a declaration that the covenants violate the dormant Commerce Clause.  Ex. C, at ¶ 56-58; 65-67.

114.    In their California complaint, Veeva and Stark affirmatively and unequivocally allege that "[a]n actual case or controversy exists over IQVIA's right to require employees, including Stark, to sign [restrictive covenants] that violate . . . the dormant commerce clause." *Id.* at ¶ 59.

115.    IQVIA contends that the restrictive covenants in the contracts of its former employees who reside and worked outside California, such as Stark, are governed by the law of the contractually-chosen state, regardless of whether the former employee is now an employee of Veeva or any other California headquartered company.  IQVIA further contends that applying California law to such restrictive covenants is itself a violation of the Dormant Commerce Clause, because that allows California law to control economic conduct, in the form of employment relationships, outside the state.

116.    An actual case and controversy thus exists as to which state's laws govern the enforceability of the restrictive covenants binding former IQVIA employees who reside and worked outside California, such as Stark, and whether it is constitutional to enforce such clauses. A declaratory judgment would terminate, and afford relief from, the uncertainty, cost, disruption, conflict, and controversy giving rise to this proceeding, and would prevent a similar situation from arising in the future.

117.    IQVIA accordingly seeks a declaration that (i) the restrictive covenants binding Stark and other former employees who reside and worked outside California are governed by the laws of the contractually-selected state, regardless of whether Veeva now employs the former

employees; (ii) the restrictive covenants are enforceable; and (iii) applying California law to such covenants is unconstitutional.

## SECOND CAUSE OF ACTION
### *Breach of the CRCA*
### *(against Stark)*

118.    IQVIA repeats and realleges paragraphs 1-117 as if fully set forth herein.

119.    The CRCA is a valid and enforceable agreement.

120.    IQVIA has fully performed its obligations under the CRCA.

121.    Stark breached his obligations under Section 3(1) of the CRCA by agreeing to perform and actually performing for Veeva, an IQVIA competitor, competitive services within one year following the end of his employment at IQVIA.

122.    Upon information and belief, Stark has breached his obligations under Section 4 of the CRCA by indirectly endeavoring, through Veeva, to solicit current IQVIA employees to leave their employment and become Veeva employees.

123.    Upon information and belief, Stark has also breached his obligations under Sections 1(a) and 3(2) of the CRCA by disclosing IQVIA's confidential information to Veeva.

124.    IQVIA has incurred damages as a direct result of Stark's breach in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### *Breach of the Stock Award Agreements*
### *(against Stark)*

125.    IQVIA repeats and realleges paragraphs 1-124 as if fully set forth herein.

126.    The Stock Award Agreements are valid and enforceable agreements.

127.    IQVIA has fully performed its obligations under the Stock Award Agreements.

128.     Stark breached his obligation under Section 12(b) of the Stock Award Agreements to comply with the restrictive covenants and confidentiality agreements that he executed with IQVIA.

129.     IQVIA has incurred damages as a direct result of Stark's breach in an amount to be determined at trial.

130.     IQVIA is also entitled to exercise its right to relief under Section 12 of the Stock Award Agreements, including but not limited to its right to rescind Stark's stock options, rights, and shares, and to require Stark to forfeit all outstanding shares for no consideration.

### FOURTH CAUSE OF ACTION
#### *Tortious Interference with Contract*
#### *(against Veeva)*

131.     IQVIA repeats and realleges paragraphs 1-130 as if fully set forth herein.

132.     IQVIA has valid and enforceable contracts – the CRCA and Stock Award Agreements – with Stark.

133.     Veeva had full knowledge of the existence of the CRCA and Stock Award Agreements between IQVIA and Stark.

134.     Indeed, Veeva affirmatively alleged in the California Action that Veeva agreed to indemnify Stark for any losses he might incur as a result of his departure from IQVIA and his employment with Veeva "because of IQVIA's NCA/NDAs."

135.     Despite knowledge of those contracts, Veeva tortiously interfered with them by, among other things, soliciting Stark (i) to resign from IQVIA while Stark was still an IQVIA employee and join Veeva before the expiration of the one-year restricted period under the CRCA; (ii) upon information and belief, to disclose IQVIA's confidential information; and (iii) upon information and belief, to assist Veeva in poaching additional IQVIA employees.

136.    Veeva's actions were intentional and conducted with the purpose of interfering with IQVIA's contract agreements with Stark and other employees.

137.    As a direct result of Veeva's tortious interference, IQVIA has incurred damages in an amount to be determined at trial.

138.    Veeva has acted in an egregious, malicious, willful and wanton manner, and in bad faith when committing the acts alleged above. As a result, IQVIA is also entitled to punitive damages.

### FIFTH CAUSE OF ACTION
*Injunctive Relief*
*(against all Defendants)*

139.    IQVIA repeats and realleges paragraphs 1-138 as if fully set forth herein.

140.    The actionable conduct of Stark and Veeva – including but not limited to Stark's acceptance and, upon information and belief, actual commencement of employment at Veeva within one year of ending his IQVIA employment, Stark's disclosure of confidential information to Veeva, and Veeva and Stark's direct and indirect solicitation of current IQVIA employees – is causing imminent and irreparable harm to IQVIA.

141.    Moreover, unless enjoined, Stark will continue disclosing confidential IQVIA information to Veeva.

142.    IQVIA therefore seeks temporary, preliminary and permanent injunctive relief against Stark enjoining him from:

>    (1) Continuing employment with Veeva within the one-year restrictive period under the CRCA;

>    (2) Directly or indirectly soliciting IQVIA employees, customers, prospective customers, suppliers, or consultants during the one-year restrictive period under the CRCA; and

(3)  Violating his confidentiality obligations under the CRCA.

143.    IQVIA also seeks temporary, preliminary and permanent injunctive relief against Veeva, and all persons acting in concert with or through Veeva who receive actual notice of the injunction, enjoining them from:

(1)  Employing Stark within the one-year restrictive period under the CRCA;

(2)  Tortiously interfering with Stark's obligation under the CRCA not to directly or indirectly solicit IQVIA employees, customers, prospective customers, suppliers, or consultants during the one-year restrictive period;

(3)  Tortiously interfering with Stark's confidentiality obligations under the CRCA; and

(4)  Tortiously interfering with any other IQVIA employees' contracts with IQVIA.

144.    IQVIA has no adequate remedy at law as to these claims. IQVIA cannot be compensated adequately for injuries by an award for damages if:  Stark remains employed by Veeva within the restricted period; Defendants improperly use, maintain, or transmit IQVIA's confidential information; or Defendants attempt to solicit IQVIA's employees, customers, prospective customers, prospective suppliers, or consultants.

145.    Defendants' intentional and wrongful conduct, as described above, unless and until enjoined and restrained by order of this Court, will disrupt the status quo and will cause great and irreparable injury to IQVIA.

146.    Stark agreed in the CRCA that IQVIA is entitled to injunctive relief without the requirement to post any bond or security for breach of the Agreement.

**PRAYER FOR RELIEF**

WHEREFORE, IQVIA respectfully requests that the Court enter judgment in favor of IQVIA and against Defendants:

(a)    Declaring that application of California law to the use or enforcement of non-competition and confidentiality agreements entered into and existing between IQVIA and employees, including Stark, where such agreements have a choice of law provision selecting the jurisdiction of states other than California, and where employees reside and work in states other than California, is unconstitutional under the Dormant Commerce Clause;

(b)    Entering temporary, preliminary and permanent injunctive relief as set forth above;

(c)    Awarding IQVIA compensatory damages in an amount to be determined at trial;

(d)    Awarding IQVIA punitive damages in an amount to be determined at trial;

(e)    Awarding IQVIA its attorneys' fees and costs;

(f)    Awarding IQVIA pre- and post-judgment interest; and

(g)    Awarding IQVIA such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: November 15, 2021

By:     */s/ Matthew D. Stockwell*

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

Kenneth W. Taber (*pro hac vice* application forthcoming)
Anne C. Lefever (*pro hac vice* application forthcoming)
Matthew D. Stockwell (NJ Bar #MS-1804)
Brian L. Beckerman (*pro hac vice* application forthcoming)
Patricia A. Rothenberg (*pro hac vice* application forthcoming)
31 West 52nd Street
New York, NY 10019-6131
Tel: (212) 858-1000
Fax: (212) 858-1500
kenneth.taber@pillsburylaw.com
anne.lefever@pillsburylaw.com
matthew.stockwell@pillsburylaw.com
brian.beckerman@pillsburylaw.com
patricia.rothenberg@pillsburylaw.com

*Counsel for Plaintiff IQVIA Inc.*